IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| WILLIAM SPIVEY ) | |
| ) | |
| v. ) | NO. 3:05-0394 |
| ) | JUDGE CAMPBELL |
| PLASTECH ENGINEERED PRODUCTS ) | |
| a/k/a LDM TECHNOLOGIES ) | |

MEMORANDUM

Pending before the Court is Defendant Plastech Engineered Products, Inc.'s Motion for Summary Judgment (Docket No. 20). For the reasons stated herein, Defendant's Motion (Docket No. 20) is GRANTED in part and DENIED in part.

FACTS

Plaintiff, William Spivey, has filed suit against Defendant, Plastech Engineered Products a/k/a LDM Technologies, alleging employment discrimination in violation of 42 U.S.C. §2002e, et seq. ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. §4-21-101, et seq. ("THRA"), alleging race discrimination, hostile work environment, constructive discharge and retaliation based upon race.

Plaintiff is an African-American male who was employed at Defendant's plant in Franklin, Tennessee from March, 2002 until April 12, 2004 (Docket No. 25 at 1). Defendant is a manufacturer of parts for the automotive industry (Docket No. 23 at 1). Plaintiff worked as a Machine Technician on Defendant's production line where Defendant's C-170 part was manufactured (Docket No. 23 at 1-2). Plaintiff initially worked on the second shift and transferred to the first shift in early 2003 (Docket No. 23 at 9-10). When Plaintiff transferred to the first shift in early 2003, Plaintiff reported to both Mike Judkins ("Judkins") and Tim

Ozarowski ("Ozarowski"). Ozarowski was officially Plaintiff's supervisor, but Ozarowski also considered Judkins to be Plaintiff's supervisor (Docket No. 23 at 10-11).

For the most part, the facts of the case remain in dispute. During Plaintiff's employment with Defendant, Plaintiff alleges that he was constantly subjected to racial harassment and a hostile work environment where unwelcome and offensive racial remarks and innuendoes were made (Docket No. 1 at 2). Plaintiff further alleges that the atmosphere in Defendant's workplace was permeated with racial overtones and comments and that employees of Defendant used the "N" word and flaunted Confederate flags on T-shirts and hats (Docket No. 1 at 2).

It is undisputed that Plaintiff had training in harassment awareness as part of his new employee orientation with Defendant and that he was familiar with Defendant's Employee Handbook and with the Open Door Policy contained in the Employee Handbook (Docket No. 23 at 9-10). While it is undisputed that the Employee Handbook contained the Open Door Policy and that Plaintiff had prepared a petition to send to corporate offices protesting the wearing of the Confederate flag at Defendant's Franklin, Tennessee plant, it is disputed whether Plaintiff was subject to threats of retaliation by his supervisors if he went over their heads (Docket No. 23 at 10). In addition, it is disputed whether Plaintiff effectively communicated his complaints of harassment to his supervisors or whether Plaintiff merely articulated nebulous concerns to Judkins and Ozarowski (Docket No. 23 at 16).

It also is undisputed that Plaintiff was good at his job and received consistently good performance evaluations (Docket No. 23 at 11). Plaintiff was disciplined only once while in Defendant's employ. The discipline related to a verbal altercation with an employee named Kern Kelley ("Kelley"), with whom Plaintiff had an extramarital affair (Docket No. 23 at 11-12).

2

According to Plaintiff, on September 4, 2003, Kelley was angry with him because he had made a birthday cake for another employee, Gloria Varga, with whom he had also had an extramarital affair (Docket No. 23 at 11). It is undisputed that Kelley began cursing Plaintiff, and that Plaintiff eventually made an inappropriate comment to Kelley (Docket No. 23 at 12). In addition, it is undisputed that Kelley made and wore a sign that reflected Plaintiff's comment, however, it is disputed whether she wore the sign on the day of the comment or the next day (Docket No. 23 at 12).

Amy Brackin ("Brackin"), Human Resources Manager for Defendant's Franklin, Tennessee facility, first learned about the incident between Plaintiff and Kelley a few weeks after it occurred (Docket No. 23 at 12). In the course of the investigation, Brackin, along with Orvil Algood ("Algood"), Defendant's Manufacturing Manager, began investigating the incident (Docket No. 23 at 13). In the course of the investigation, Plaintiff admitted to having made the statement (Docket No. 23 at 13). As a consequence of the investigation, Brackin issued Plaintiff a "final written warning" which is the discipline that Brackin generally issued for comments deemed sexually harassing, and the most serious form of discipline other than termination (Docket No. 23 at 13). Brackin made the decision to issue the final written warning without consulting Judkins, Ozarowski or any one else in Spivey's chain of command (Docket No. 23 at 13). It is disputed whether Brackin was aware of the sign Kelley wore before issuing Plaintiff the final written warning. Plaintiff asserts that Kelley and Plaintiff informed Brackin of the sign on September 24, 2003, prior to issuance of the final warning (Docket No. 23 at 14). Brackin, however, asserts that she did not learn of the sign until after she had decided to discipline Plaintiff, but admits that Plaintiff had informed her of the sign wearing incident (Docket No. 23

3

at 14). It is further disputed whether Brackin ever asked Plaintiff to write a written statement confirming the sign wearing incident, and whether his refusal to do so led Brackin to believe the incident was not true (Docket No. 23 at 14).

In 2004, Defendant ceased production of the C-170 part (Docket No. 23 at 2). Defendant asserts that in conjunction with the cessation of production of the C-170 part, Defendant conducted a reduction in force from 384 to 335 employees, and that the number of employees reduced at its Franklin, Tennessee facility corresponded with the number of employees who had worked on the C-170 line (Docket No. 23 at 1-2). In connection with the reduction in force, Defendant allowed employees who were in higher-paying jobs and who had higher seniority, such as Plaintiff, to "bump" lower-paid employees on the production line, and did not strictly follow the layoff policy in its Employee Handbook (Docket No. 23 at 3). Defendant asserts that because the reduction of force was not a plant-wide reduction but stemmed from the elimination of one line, the Company did not need to follow the layoff policies set forth in Defendant's Employee Handbook, which Defendant contends addresses only layoffs and not bumping rights (Docket No. 23 at 3 and 5). Furthermore, Defendant asserts that its method of reducing its force in this case was consistent with similar reductions that had been conducted in past years and was based strictly on seniority (Docket No. 23 at 3).

Plaintiff disputes Defendant's assertion that the reduction in force was related to cessation of production of the C-170 part, and instead contends that the layoffs were a result of a plant wide reduction in force that included only ten people who worked on the C-170 part and to which the layoff policies in the Employee Handbook applies (Docket No. 23 at 2-3). In support of his assertions, Plaintiff contends that production of the C-170 part was replaced by production

4

of a defroster grill, and that the C-170 part was produced on the CDW production line which also produced U228 Clusters, U228 center finish panels, A-88's, defroster grills, Ford clusters, Thumb wheels, doors for U228, and 302 center finish panels for Lincoln Navigators (Docket No. 23 at 2).

In connection with the reduction in force, Plaintiff was given the option of bumping a Production Specialist in either Defendant's Molding Department or Finishing Department (Docket No. 23 at 4). It is undisputed that Plaintiff chose the position in Defendant's Molding Department, a position that paid $10.00 per hour as opposed to the $14.14 per hour Plaintiff was making as a Machine Technician (Docket No. 23 at 4, 7 and 8). It is disputed, however, whether Plaintiff should have been able to bump another Maintenance Tech on another shift, as Plaintiff maintains is spelled out in the Employee Handbook (Docket No. 23 at 4-5). It is further disputed whether the reduction in work force was based strictly on seniority. Plaintiff asserts that James Bartley ("Bartley") and Ricky Taylor ("Taylor"), both Caucasians, remained in their jobs as Machine Technicians, even though Plaintiff had the most seniority (Docket No. 23 at 3). In addition, Plaintiff maintains that Bartley, took over his position of Machine Technician after he was reassigned (Docket No. 23 at 5-6). Furthermore, Plaintiff claims that Keith Bartlett ("Bartlett"), a white employee who was also part of the reduction in force and whose job was eliminated several weeks before Plaintiff's, was given the option to take a Material Handler position, a position that Plaintiff claims paid more than a Production Specialist (Docket No. 23 at 4, 7 and 25).

Plaintiff worked in the Production Specialist job in the Molding Department for two to three weeks before resigning his employment with Defendant (Docket No. 23 at 6). Before

5

resigning, Plaintiff took vacation from his employ with Defendant to work at his new job and make sure it was suitable (Docket No. 23 at 9).

On May 15, 2004, Plaintiff filed a charge of discrimination with the EEOC as follows:

> I. Around September 29, 2003, I was wrote up for making inappropriate comments. In November 2003, I was denied overtime hours. Around March 30, 2004, I was transferred from machine tech to a mold/press operator. On April 12, 2004, I resigned. Plastech Engineered Products is a manufacturing company and has at least fifteen employees. My date of hire is March 18, 2002.
>
> II. Throughout my employment at Plastech, I have made it known that racial comments and the confederate flag offend me. In July 2003, I filed a verbal complaint with a supervisor regarding the confederate flag. On October 18, 2003, I verbally complained again about the flag being worn on T-shirts and hats. I started getting signatures from employees who were offended by the confederate flag. The plant manager told me this was inappropriate for me to do. Shortly after that, I was denied overtime and I was demoted with less pay. I was transferred from machine tech to a mold/press operator. On April 12, 2004 I felt compelled to resign due to the harassment and retaliation directed towards me.
>
> III. I believe I have been discriminated and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Docket No. 20, Part 7).

Defendant has requested summary judgment (Docket No. 20) in this case arguing that Plaintiff's complaint exceeds the scope of his EEOC charge. Defendant also argues that Plaintiff cannot establish retaliation as a matter of law. In addition Defendant argues that Plaintiff cannot establish that Defendant's Franklin, Tennessee facility was a hostile work environment. Furthermore, Defendant asserts that Plaintiff cannot establish that he was constructively discharged. Finally, Defendant argues that Plaintiff's claim of negligent supervision must be dismissed as it is not a cognizable claim under Tennessee law.

SUMMARY JUDGMENT

6

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Meyers v. Columbia/HCA Healthcare Corp., 341 F.3d 461, 466 (6th Cir. 2003). In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party. Id.; Hopson v. DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

To prevail, the non-movant must produce specific evidence that demonstrates there is a genuine issue of material fact for trial. Meyers, 341 F.3d at 466. A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. Id. The non-moving party may not rest on mere allegations but must set forth specific facts showing that there is a genuine issue for trial. Hopson, 306 F.3d at 432.

## ANALYSIS

1. Scope of EEOC Charge.

In order for federal courts to have subject matter jurisdiction of Title VII claims, the claimant must first unsuccessfully pursue administrative relief. Ang v. Procter & Gamble Co., 932 F. 2d 540, 545 (6th Cir. 1991). This exhaustion requirement puts the employer on notice of the charges against it and affords the EEOC an opportunity to settle the dispute. Harper v. Godfrey Co., 45 F. 3d 143, 147-148 (7th Cir. 1994). The judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination. Ang, 932 F. 2d at 545; Hegwood v. Pharmacia/Upjohn, 985 F. Supp. 728, 735 (W.D. Mich. 1997). Where a Title VII claimant is not represented by an attorney in drafting the

7

charge, a broader reading of the charge is required. Duggins v. Steak 'N Shake, Inc., 195 F. 3d 828, 832 (6th Cir. 1999). The Sixth Circuit has explained that "'where facts related with respect to the charged claim would prompt the EEOC to investigate a different uncharged claim, the plaintiff is not precluded from bringing suit on the claim.'" Id. (quoting Davis v. Sodexho Cumberland College Cafeteria, 157 F. 3d 460, 463 (6th Cir. 1998)).

In support of its motion for summary judgment, Defendant asserts that Plaintiff's claim that he was "overloaded with work" was not properly raised in his EEOC charge and should not be considered as part of this lawsuit. More specifically, Defendant asserts that Plaintiff's complaint alleges he was "denied overtime hours but overloaded with work"as the basis for his claim for retaliation, whereas Plaintiff's EEOC charge merely states he was "denied overtime" and "demoted".

In response to Defendant's assertions, Plaintiff contends that his EEOC charge is sufficient to allow his claims of overwork, and that the EEOC had information from him and Defendant's attorney from with they should have investigated his overwork complaint.

The Court finds that Plaintiff's EEOC is drafted in such a way as to put Defendant on notice of Plaintiff's claim of overwork and the EEOC a chance to investigate the charge. Implicit in Plaintiff's charge that he was "denied overtime hours" and "denied overtime" is either the charge that Plaintiff was required to work hours for which he was not paid or that Plaintiff was denied the opportunity to earn extra compensation by working overtime hours. Regardless of what interpretation is adopted, it is reasonable to expect that an investigation of Plaintiff's work load and hours would grow out of an investigation of Defendant's overtime policies and

8

procedures. Accordingly, the Court finds that Plaintiff's Complaint (Docket No. 1) does not exceed the scope of his EEOC charge.

2. Retaliation Claim.

In order to establish a prima facie case of retaliation based upon race, Plaintiff must show that: 1) he engaged in an activity protected under Title VII; 2) his exercise of that protected right was known to the Defendant; 3) he suffered an adverse employment action, or he was subjected to severe or pervasive retaliatory harassment by a supervisor; and 4) there is a causal connection between the protected activity and the adverse employment action or harassment. Morris v. Oldham County Fiscal Court, 201 F. 3d 784, 792 (6th Cir. 2000). See also, Little v. BP Exploration & Oil Co., 265 F. 3d 357, 363 (6th Cir. 2001).[1]

To support its motion for summary judgment, Defendant asserts that Plaintiff cannot establish a causal connection between the alleged protected activity and the alleged adverse employment action. More specifically, Defendant asserts that his transfer to the position of Production Specialist more than the six months after the date he alleges in his EEOC complaint that he complained about the Confederate flag does not establish the requisite proximity of time required to support a charge of discrimination. Furthermore, Defendant asserts that even if Plaintiff can establish his prima facie case of retaliation, Defendant can articulate a legitimate

---

[1] Because the analysis of THRA claims essentially tracks claims under Title VII, Plaintiff's THRA claims will be discussed in the context of Plaintiff's Title VII claims. Patterson v. McLean Credit Union, 491 U.S. 164, 185-88, 109 S. Ct. 2363, 2377-78, 105 L. Ed. 2d 132 (1989) overruling on other grounds recognized in, Hamilton v. City of Martin, 129 F. 3d 1264 (6th Cir. 1997); Harper v. BP Exploration & Oil Co., 896 F. Supp. 743, 747 (M.D. Tenn. 1995), aff'd, 134 F. 3d 371 (6th Cir. 1998); Campbell v. Florida Steel Corp., 919 S.W. 2d 26, 31 (Tenn. 1996).

9

non-discriminatory reason for the elimination of Plaintiff's position, namely the elimination of the C-170 part and the corresponding reduction in force.

In response to Defendant's allegations, Plaintiff asserts that he complained of Confederate flag symbols and racial slurs on a ongoing basis and that there is causal connection between his complaints of racial harassment and the flaunting of the Confederate flag on T-shirts, hats and elsewhere and his loss of overtime and his demotion from Machine Technician to Production Specialist. Furthermore, Plaintiff asserts that Defendant's articulated reason for his transfer of positions is simply pretext for discrimination. More specifically, Plaintiff asserts that the plant-wide reduction in force had nothing to do with the elimination of his job in that the C-170 part was only one small aspect of his job and that he had more than enough work remaining after elimination of the C-170 part. In addition, Plaintiff asserts that the plant-wide reduction in force was insufficient to motivate his demotion in that Bartley was reassigned to his job.

The Court finds that there are material facts in dispute regarding Plaintiff's claim of retaliation and the causal connection necessary to establish such claim. For instance, it is disputed whether Plaintiff's complaints of harassment to his supervisors are limited to the July and October, 2003 complaints referenced in Plaintiff's EEOC charge or are more extensive and span "throughout Plaintiff's employment", as also alleged in the EEOC charge (Docket No. 20, Part 7). Also, it is disputed whether Ozarowski heard Plaintiff complain about employees wearing the Confederate flag, or whether Plaintiff merely articulated ill defined complaints to Ozarowski (Docket No. 23 at 16). In addition, it is disputed whether Algood was aware of Plaintiff's alleged ongoing complaints regarding the presence of Confederate flags at

10

Defendant's Franklin, Tennessee facility, and whether Algood took prompt action immediately upon learning of Plaintiff's complaints (Docket No. 23 at 17-18).

Similarly, with respect to Defendant's argument that the elimination of the C-170 part and the corresponding reduction in force serves as a legitimate non-discriminatory reason for Plaintiff's demotion, the Court finds that there remain questions of fact for determination at trial whether Defendant's articulated reason for Plaintiff's demotion is merely a pretext for discrimination. For example, it remains disputed whether Defendant's reduction in force from 384 to 335 employees was a plant-wide reduction to which Defendant's layoff policies in its Employee Handbook applied or whether Defendant's reduction in force stemmed from the elimination of the C-170 line for which the Company did not need to follow the layoff policies set forth in its Employee Handbook (Docket No. 23 at 3 and 5). Furthermore, it is disputed whether Defendant's method of reducing its force was consistent with similar reductions it had conducted in the past and was based strictly on seniority (Docket No. 23 at 3). In addition, it is disputed whether Defendant's Employee Handbook addresses layoffs and not bumping rights (Docket No. 23 at 3). Finally, it is disputed whether the number of employees reduced at Defendant's Franklin, Tennessee facility corresponds with the number of employees on the C-170 line or whether the reduction affected only 10 employees who worked on the C-170 line and not the more than thirty employees who were let go ((Docket No. 23 at 2-3).

Accordingly, given the facts in dispute, the Court finds that Defendant's Motion for Summary Judgment (Docket No. 20) on Plaintiff's retaliation claim is DENIED.

11

3. Hostile Work Environment.

In order to establish a case of hostile work environment based upon race, Plaintiff must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based upon his race; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile or offensive work environment; and (5) employer liability exists. Newman v. Federal Exp. Corp., 266 F. 3d 401, 405 (6th Cir. 2001). A hostile work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed 2d 662 (1998).

Not all offensive conduct is actionable as harassment. Simply teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. Id, 118 S. Ct. at 2283-84. In determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the Court must consider the totality of the circumstances and the following factors: the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. Newman, 266 F. 3d at 405.

In support of its motion for summary judgment, Defendant asserts that Plaintiff's allegations of harassment are not related to his race and do not come close to meeting the standard for a racially hostile work environment. In addition, Defendant asserts that to the extent that Plaintiff alleges conduct that is related to race, Plaintiff's allegations do not represent

12

pervasive and relentless racial harassment. Furthermore, Defendant asserts that while Plaintiff may have found displays of the Confederate flag offensive, displays of the Confederate flag objectively may not contribute to a hostile work environment. Finally, Defendant asserts that the fact that Plaintiff was required to clean racial slurs off the walls of bathrooms and received more work than other employees does not support his claim of hostile work environment.

In response to Defendant's allegations, Plaintiff asserts that Defendant's investigation into the Kelley incident was discriminatory in that he had reported many inappropriate comments made by white employees and none of them had been investigated. Plaintiff also alleges that with respect to the reduction in force, none of the other white Machine Technicians who also worked on the C-170 part were demoted. In addition, Plaintiff asserts that the continual flaunting of the Confederate flag and racial slurs and graffiti on the bathroom walls all are evidence of a hostile work environment.

The Court finds that material questions of fact exist whether Plaintiff was subject to a hostile work environment. For example, it is disputed whether the "n" word was used commonly in Defendant's Franklin, Tennessee plant, whether the plant was permeated with offensive Confederate flag paraphernalia and racially offensive graffiti, and whether Defendant took prompt immediate action to remove such offensive material upon learning of its existence (Docket No. 23 at 17-23). In addition, the Court finds that it remains disputed whether Plaintiff was given more work than anyone else because he was a good employee and desired overtime or because he was African-American (Docket No. 23 at 21). Furthermore, facts remain in dispute over the practices employed by Defendant in connection with its reduction in force and whether white employees with less seniority than Plaintiff were allowed to remain in their jobs as

13

Machine Technicians after elimination of the C-170 part while Plaintiff was forced to take a lesser position (Docket No. 23 at 3). Finally, disputed questions of fact remain over the Kelley incident and whether Plaintiff, who was given a final warning without the consultation of his immediate supervisors, was reprimanded because he was African-American, whereas Kelley, who is white, and admittedly culpable in the incident, avoided discipline ((Docket No. 23 at 13-14 and Docket No. 27).

Accordingly, given the facts in dispute, Defendant's Motion for Summary Judgment (Docket No. 20) on Plaintiff's Hostile Work Environment claim is DENIED.

4. Disparate Treatment.

In order to establish a claim for disparate treatment, Plaintiff must show: 1) he was a member of a protected class; 2) he suffered an adverse employment action; 3) he was qualified for the position; and 4) he was replaced by someone outside the protected class or was treated differently from similarly situated employee. Warfield Lebanon Correctional. Inst., 181 F. 3d 723, 728-729 (6th Cir. 1999).

In support of its Motion for Summary Judgment (Docket No. 20), Defendant first alleges that Plaintiff's EEOC charge does not incorporate a claim for disparate treatment.

The Court finds that Plaintiff's EEOC charge is drafted in such a way as to put Defendant on notice of Plaintiff's claim of disparate treatment and the EEOC a chance to investigate the charge. Plaintiff's charge that he was "denied overtime hours" and "demoted with less pay" for "getting signatures from employees who were offended by the confederate flag" clearly implies that he was treated differently than employees who did not lodge such complaints. Furthermore, it is reasonable to expect that an investigation of any disparate treatment afforded Plaintiff to

14

grow out of an investigation of Plaintiff's charge. See, Ang, 932 F. 2d at 545. Accordingly, the Court finds that Plaintiff's complaint does not exceed the scope of his EEOC charge.

Defendant also alleges that Spivey's claim of disparate treatment is factually weak and his complaints that he was treated differently than similarly situated white employees under Defendant's "point system" are not sufficient to establish a prima facie case of disparate treatment. In addition, Defendant alleges that Plaintiff cannot show that he was replaced by someone outside the protected class in that an employee is not replaced when his duties are redistributed among remaining employees. Furthermore, Defendant asserts that Plaintiff cannot show that he was treated differently than similarly situated non-African-American employees. Finally, Defendant asserts that even if Plaintiff is able to establish his prima facie case, he cannot show that Defendant's legitimate, non-discriminatory reason for eliminating Plaintiff's position, the elimination of the C-170 part, was pretext for discrimination.

The Court finds that given the material facts in dispute whether white employees with less seniority than Plaintiff were allowed to remain in their jobs as Machine Technicians after elimination of the C-170 part while Plaintiff was forced to take a lesser position makes summary judgment inappropriate at this time (Docket No. 23 at 3). Furthermore, the disputed facts regarding the reasoning behind Plaintiff's increased work load and the failure of Defendant to follow the procedures outlined in its Employee Handbook in connection with its reduction in force from 384 to 335 employees also makes summary judgment on Plaintiff's claim of disparate treatment inappropriate at this time (Docket No. 23 at 3 and 5). Accordingly, Defendant's Motion for Summary Judgment (Docket No. 20) on Plaintiff's disparate treatment claim is DENIED.

5. Constructive Discharge.

In order to establish a prima facie case of constructive discharge, Plaintiff must show that:

1) Defendant deliberately created intolerable working conditions, as perceived by a reasonable person; and 2) Defendant did so with the intention of forcing Plaintiff to quit. Logan v. Denny's, Inc., 259 F. 3d 558, 568-69 (6th Cir. 2001). Factors to consider in determining whether a reasonable person would have felt compelled to resign include whether the actions of the employer involved: 1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment or humiliation by Defendant calculated to encourage Plaintiff's resignation; or 7) offers of early retirement or continued employment on terms less favorable than the employee's former status. Id.

Given the evidence before the Court that Plaintiff was demoted from the position of Machine Technician at a salary of $14.14 per hour to a lesser position that paid $10.00 per hour, and disputed questions of fact whether white employees with less seniority than Plaintiff were allowed to remain in their jobs as Machine Technicians after elimination of the C-170 part, the Court finds that material questions of fact remain whether Defendant deliberately created intolerable working conditions with the intention of forcing Plaintiff to quit or whether Defendant's actions were the result of an appropriately conducted reduction in force (Docket No. 23 at 4, 7). Accordingly, Defendant's Motion for Summary Judgment (Docket No. 20) on Plaintiff's claim for constructive discharge is DENIED.

16

6. Negligent Supervision.

In response to Defendant's Motion for Summary Judgment (Docket No. 20), Plaintiff has dismissed his claim for negligent supervision under Tennessee common law. Accordingly, Defendant's Motion for Summary Judgment (Docket No. 20) on Plaintiff's claim for negligent supervision is GRANTED, and Plaintiff's claim for negligent supervision is DISMISSED.

The pretrial conference currently set for August 21, 2006 at 1:00 p.m. and the trial currently set for August 29, 2006 at 9:00 a.m. remain set.

IT IS SO ORDERED.

*Todd Campbell*
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE